Case number 14-5182, Pharmaceutical Research and Manufacturers of America Appellant v. Federal Trade Commission. Mr. Young for the appellant, Ms. Arrington for the appellee. May it please the court, this rule relies on an assertion of FTC power. The power to selectively impose notification obligations on a single industry, a power that FTC never claimed for four decades, and one that, if accepted, would fundamentally rewrite the Hart-Scott-Rodino Act. Essential to understanding how that act operates, Congress purposefully divided the question of what is covered from the question of who is subject to notification. And as to the first, what is covered, Congress, in the act, gives to FTC the authority to define what constitutes an asset acquisition. But Congress treated the who question very differently. You say this is a Chevron one case, right? Yes, Your Honor. So help me think that through a little bit. And you do it based on your no-person language. The no-person language of the statute says leads to no other conclusion than the one you're arguing for, and that is that the FTC cannot make these industry-specific rules. Now, help me understand that. Why is it so clear? I mean, it seems to me it's not a bad argument for statutory interpretation, but you've got to do better than that under Chevron. You've got to say that that was the only reasonable interpretation you come up with. How is that the only reasonable interpretation? Your Honor, I think it's because the who question is decided both based on the no-person mandate, and then the other part of the statute in which who is addressed is the exemption authority. Congress is quite clear in saying when it comes to who is subject to notification, no person may evade notification except as exempted either by Congress itself directly or by the commission upon a specific finding that whomever it exempts is not likely to violate the antitrust laws. And that's the direct quote in the statute. Well, don't you have, I mean, you don't dispute the FTC's authority to have promulgated regulations specific to, for example, the banking industry. No, that's correct. In defining hold. There's a regulation that defines hold to cover a bank or trust company. Not everybody, not any person, but a bank or trust company. Right? That is correct, Your Honor. So they can make industry-specific rules. We have never said that an industry-specific reference or definition is absolutely foreclosed. And there are two important things, I think, to keep in mind about the insurance and banking. The first is that that's an example of Congress making an exemption. Subsection C-11 deals with those types of industries. So it's quite telling that FTC's only example, really, of industry-specific definitions even, not impositions, but is one in which Congress has spoken to it. Here, there's nothing about the pharmaceutical industry or all other industries except for pharmaceutical industry. And it is, in fact, a direct imposition on a single industry. So when we have the no-person mandate combined with express text that says if you want someone to not be covered, once you define something to be an asset, that's the what question. FTC's sole authority to address the who question comes in an exemption that's targeted at a particular industry and says that that industry or person or whatever it exempts is not likely to violate the antitrust law. What if the FTC found that the only industry that we're aware of that engages in these sort of partial, exclusive licenses and does so at a value level, the cost of these partial, exclusive licenses, transferring all material commercial rights is high enough to trigger the thresholds, is the pharmaceutical industry? If that's their determination, that you're the only industry that does it at this level, that you have things that are this valuable that you can get less than the entire right and split up some of the rights, manufacturing from the others, you're the only ones that do it. Why should they have to write a rule up front that says there is nobody else? I mean, they could say any person, but there would be nobody but the pharmaceutical industry. Well, the simple answer is that that is the requirement that Congress gives. It's a prophylactic statute that, in its very nature, assumes that the agency doesn't know everything, what industries might arise, what industries are out there that it doesn't have experience with, as it claims it doesn't have experience with other industries with this transaction. But maybe another way to look at it is, if that really is true, and the pharmaceutical industry were the only one where this kind of transaction occurs, which is not this case, the FTC concedes that they typically see it in pharmaceutical industry, not that it only could or does exist here. But even if that were the case, what would be the harm, or what benefit would there be, maybe is a better way to ask it, in doing something different than the way they've always done it, the way Congress expects them to do it, which is to say, adopt a general rule, saying here's what an asset is, and then follow the no-person mandate. Now, it turns out that only pharmaceutical is going to be filing notifications, no problem. Well, maybe what they're going to do is look at, they're defining the terms asset acquisition. And, you know, we're not sure whether a partial exclusive license will have the commercial value, or be able to figure that out in other industries. And it's never happened, at least at this value level, this $50 million or $90 million value level. And we want to be careful in deciding when these types of unusual asset acquisitions are asset acquisitions for the purpose of this statute. We've got experience here, this is valuable stuff in the pharmaceutical industry, and they consider it, for practical purposes, it's an asset acquisition for them, and it triggers these concerns. We just want to be careful. Well, Your Honor, the answer is that Congress said when you're being careful, when you're regulating incrementally, you're carving away, not adding to. And when there's any doubt in the matter, the full point is... Well, how can they carve away? How can they decide that there's no anti-competitive implications for industry practices they've never seen? They haven't found anyone who's ever done it. So how can you assess anti-competitive nature of something that's never happened to their knowledge? Because that's the whole point of the Hart-Scott-Rodino Act, is to bring notifications so that the agency will gather that kind of information. How are they going to gather it? Because people will have to file the notification if, in fact, it's an asset acquisition. I thought you said, maybe I misunderstood, was that the way they should have done this is pass an exemption, write a general thing and then say everybody's out except the pharmaceutical industry. No, no, no. I don't say that at all because what an exemption requires is a specific point. It's what Congress says, D2B of the statute. You have to show that whomever is exempted is not likely to violate the energy laws. Well, that's exactly my point. So if they had, instead of defining asset acquisition, they had said, this rule applies, they'd written it as a generic rule, any person instead of any pharmaceutical industry, right? And then they passed another determination that said, if there's anyone else in the world that does this, we're not aware of it, but you think it wouldn't be any competitive? No. That's how they should do it. I just don't know how they can make that determination, and so why is that their only route? It seems silly. Well, that's starting from the premise that they can do what they want to do based on ignorance, based on a lack of experience. That's not ignorance. They can define asset acquisition, and they have a particular circumstance that seems to meet the definition of asset acquisition as it operates in this particular industry. Well, you know, they – Let's admit the statute does give them awfully broad authority to define terms. This is a really – I mean, the district court called it a blank slate. I'm not certain that's quite right, but it's awfully broad authority that's running up against your no person argument. No, that's because it's a difference between what and who. That authority defined what an asset is, which is the way they've always done it. This is the first time they've said, well, we see prevalence of this sort of transaction in the pharmaceutical industry. They back that up with 66 filings that they don't dispute involve none of the kinds of transactions that are at issue here because they arose under the prior rule and were just straight up patent – exclusive patent licenses. They cite a database that they themselves recognize only has a tiny fraction of inquiries by unknown people for unknown reasons. They don't say how many, if any, of those involve the kind of transactions at issue here. If there were a case to start imposing coverage selectively on particular industries, this wouldn't be that case. They've never in 40 years found a single example, even before that, before the Scott Rudin Act was passed, in which this kind of transaction targeted – You're saying their factual basis is wrong. Yes, there's – But I mean, they're saying in the rule of the – they said when they promulgated the rule that to the extent that there are others who engage in similar activity, they remain potentially reportable events too. I'm just not following your argument. If they can find only one example of this and they have the authority to define the term, the who is clearly only the persons they've found so far. And they've said if we find others, they will be within the who too. I don't know how that – it's certainly not Chevron 1. Well, Your Honor, it could be Chevron 2, but – It's absolutely not Chevron 1. I mean, I'm just not understanding conceptually. They are entitled to define the asset term, and they're entitled to regulate, and they say out front this is the only industry in which we can find it. So that can be the only who. If that were the case? Well, that's a factual argument. You can argue that the record doesn't support that conclusion, but assuming they're right – Correct, assuming that. Assuming the who, that does not violate the statute, especially when they say if we can find any more who fit within the who, they're going to be covered too. So there's no discrimination. It's an anyway patent. I'm just not following you. There can be no other who if they are right that only this industry does it. That's who. They do not say that only this industry does it. They say we typically see – That's your claim about what the record says. But if they're right in what they're saying – If they're right – You're really wrong in this argument. I don't think so, Your Honor, because if – But do you agree that if – we would all agree in this room, the only who can be X, that they could have this kind of regulation? I would not agree to that, Your Honor. That's where I think your argument makes no sense whatsoever. Just try to explain why. Why wouldn't you agree with that? I wouldn't agree with it because the whole purpose of the Hart-Scott-Rodino Act and the whole way that they have applied it for its entire history is to say, even if there's only one who that we can imagine, we write a neutral rule. If it turns out that we're wrong or that an industry emerges that was unforeseen, Congress has said if this is an asset acquisition, whoever it arises with – And you base that on the no-person clause. And the except as exempted. We have those two references to persons. And I hasten to add that this is not something that we're just making up. This is the way it always has been. The agency – The fact that something has always been a certain way doesn't mean an agency can't figure out something going forward and do it better. That is true, Your Honor, but here they have given no rational explanation on a reasoned basis. Well, that goes to the record argument. That's a different argument. You're arguing it's arbitrary and capricious, I guess, because the record doesn't support their assumptions. But that's a different argument. But your so-called Chevron one, there's no way they can do this argument. It makes no sense whatsoever. If it is true, only one group fits the who. It just doesn't make any sense. The statutory structures may be weakened. With this broad authority that this agency has under this statute, and they can show there's only one group that fits the who, and if we find anyone else, we'll put them in it too. That doesn't violate the statute. It does, Your Honor, and I guess I'll turn to Chevron two briefly if I may. If the Chevron one argument is unavailing, you nonetheless have a statutory structure that is predicated on the idea of general, neutral regulation, even if there's only one who, because if there's only one who, the general regulation is still going to only capture that one who. There is no harm to the agency doing something like it's done for the first time with it. But your definition becomes sloppy. If you have only one who, and you're the agency, you would define by reference to the industry found, because it'll make sense to the regulated industry. That's what a good agency official will do. If there's only one who in this area, your regulation would reference them, because it's going to be clear and tidy, as opposed to some general thing where your understanding is we know who the who is, but we're going to write it very broadly so no one will know what we're talking about. Now, baking the who into the what is very problematic. It's not problematic. I don't understand the mischief. What is the mischief? The mischief is that we're taking – Other than your client is regulated. Well, it's that there is not an adequate basis to have the kind of notice and comment that the agency should have. That's a record argument. Well, I think the Congress is trying to create – The Chevron one argument blows this away. I can't speak for my colleagues, but I would suggest it might blow them away. I know it blows me away. I don't get it. Your record argument, I hear you. You're either right or wrong on the record. But the Chevron one argument just makes no sense. I don't even think it's cute. I think it's just a bad argument. Well, I think that the other argument that my colleague on the other side has renders superfluous the no person and the accept as exemption provision. Now, from this point forward, FTC can regulate instead of generally and neutrally and even-handedly by choosing industries that favors or disfavors for whatever reason or none, and it makes the review by this Court exceedingly difficult. No, it does not lead to that. If the requirement is that is you have to be able to assert, we can't find anyone else. And that's why we've cast the rule in these terms. Well, if they had even asserted that, that would be a different case. What they say is we typically see this in pharmaceutical industry. Don't know why. They don't have experience with other industries. They don't say that other industries this could never arise or does never arise. In fact, most of the data that they're using, and this is both Chevron and APA, relies on transactions that are not those that are targeted, just the exclusive patent license. The record argument is your record argument. Okay. It's not Chevron one. On Chevron two, if I can for just a moment explain this. We have a long history in which Congress has crafted this statute for one purpose only, and that is to ensure that if this kind of transaction were to arise anywhere, that everyone will provide notification no matter how rare it might be in any given industry or whether it even exists yet in a given industry. In that regard, just imagine, I have no idea, but imagine hypothetically industrial solvents engage in these same types of transactions and aren't covered. How is your client hurt? Since you don't seem to challenge the substance of the rule, how are you hurt by the fact that the rule isn't applied to industrial solvent companies? Well, it's important. Our injury is not that someone else isn't also regulated. That is a separate question, the what question. If this Court vacates this rule as we ask it to, then if the agency, and it's speculative whether it even would, tries to impose the general rule that it threatens to do, then the industrial solvents and everyone else would be able to participate in the notice and comment rulemaking where we could persuade the agency. And you're here representing the right of other companies to provide notice and comment rulemaking? Our injury is being subject to all of these requirements. We're the one industry that is targeted. The reason that this rule is unlawful is that it goes about notice and comment rulemaking to seek precedent on the cheap. We're going to target one industry so that really only one industry is on notice that it needs to comment in order to be able to label something that we've never had a single instance of an enterprise problem. So if we remanded and they wrote the rule more broadly, you'd be in the same position? Well, we wouldn't be because it would be a different rule. They don't say we can back up this rule with a little more data. They say if you tell us that this is no good, what we're going to do is we'll expand it to everyone, thereby prejudging the notice and comment that would occur when the whole world is subject to being able to say if these transactions happen, and frankly, that would be a pretty good way to find out what they say they're ignorant of right now. We don't know about these transactions in other industries. They haven't said it never happens or couldn't or it's inherent in pharmaceutical. If they pass a general rule and only pharmaceutical industry has any skin in the game, then probably only the pharmaceutical industry would comment. But we don't know that because they have expressly – Do you happen to know of any other industries that do this? Well, I know of a Ninth Circuit case that you can go back to the 1930s in which they have exclusive patent licenses with retained rights in the motion picture industry. Was that distribution rights that were retained? Well, the question of what is distribution even is a question. That's getting into the Varner Declaration and other things. It's some stick in that bundle, make, use, and sell, I think, again, make that was retained. And the point is, if that really is an asset acquisition, which I think it probably is questionable whether that's so, there's no reason to think, and the FTC has never said, that it really couldn't erupt. They thought at one point that the incentives for the pharmaceutical industry were higher. Well, after notice and comment, they abandoned that because it really isn't true. Well, it's not just incentives. I mean, there has to be a threshold value amount. And they don't rely on that. They say it's prevalence. That is it. We've got prevalence, and prevalence alone justifying targeting for the first time in history, one industry for a kind of transaction that they have never, before or after the Scott Rodino Act, before or after consummation, ever sought to unwind, penalize. But just to be clear, you don't otherwise challenge, if they were able to go back and just scratch out anything that sounded industry-specific so that it would no longer be industry-specific on a reading, you have no objection? We will challenge that. That's something that I'm prepared to represent to the court, that that's something that we're ready to challenge. The case before the court today is the... But you didn't challenge it here in case you were to lose it. I'm not saying one way or the other, but in case you were to lose this reading, you'd be stuck with this rule without having made those substantive challenges? If you rule against us on all our points, then that's it. We're not going to have a sense to go back to another notice of comment. But what we say is we've presented a clear matter of law, Chevron 1, Chevron 2, APA argument, as to why this rule should not be allowed to be a precedent that can be set to give the agency an unclaimed power that subverts the structure of the Act. And if you do that, if you recognize this is a new, uncharted step, one that's not lawful based on what Congress was trying to achieve and what it did in the statute, if they want to go back and impose a new rule, it would be a neutral one applied to all industries, they say that themselves, then we would be in a position to finally have a rule they would have to reveal all of their data, where we and all of our sister industries would be able to comment as to why this definition of asset acquisition is improper. That isn't the case. That's the what question. What we've got in this case before the Court is the who question. Can they bake who into the definition of what? They've never done it before. They shouldn't do it here. Text, structure, and purpose of this Act all converge in the same direction, saying this agency needs to do what Congress has delegated. It's an important job, but it's not what they've tried to seize here. And I thank the Court. Thank you. We'll give you a couple minutes back. Thank you. Thank you. Good morning, Rob. It's Michelle Arrington for the Federal Trade Commission. Are you making a standing argument or not? You kind of dropped a hint in your brief and then plowed ahead, which I wouldn't expect the government to be doing. Well, we're not making the direct standing argument because they are asking for vacator of the rule. And if that were to happen, then there would not be a rule for the commission to enforce against them for some period of time. So why mention it at all? Because it does highlight the very odd nature of their argument where they haven't challenged the substance of the rule or frankly even whether they can be required to report these sort of transactions. What they're arguing is that the rule is too narrow because we haven't regulated everybody else. And it is very difficult to see how the pharmaceutical industry is injured by a rule that they don't challenge the substance of. But because they do ask for vacator, which we don't think is appropriate, even if this court were to agree with some of their arguments for the reasons we've stated in the brief, if the court were vacated, there would be redress available to them. So that's why we don't make the full frontal argument on that. But, Your Honors, I won't spend long on the Chevron argument unless you have specific questions. I would note that their argument depends on inserting a lot of extra words and a lot of extra explanation that is simply not. Well, maybe it just means that you have to read any person in conjunction with, I'm sorry if I have my BTB or whatever, the exemption clause, which says, and if you're not going to be any person, the only way any person gets out is if you make a specific finding of no anti-competitive risk. Well, I mean, the Commission has not exempted anybody. It has not said that pharma, to the extent that there are other industries other than pharma that engage in these sort of transactions that have the same sort of anti-competitive potential, that they're off the hook, what the Commission has done here. Well, what do you mean? It sounds like you might think about them later. What if, in fact, and I'm just completely making this up, but an industrial solvents company did the exact same thing, that if they were a pharmaceutical company they would have to report? You know, the exact same, or an energy drink, pick your hypothetical, but any of these companies did the exact same thing right now today, would they have to file a report? If it's not, if it doesn't come within what the Commission has long advised is a sort of exclusive patent license that is typically reported. It's exclusive patent licensing except that the patent holder says, I'll manufacture, you use and sell. Then right now there would not be a rule that clearly requires them to do that. That clearly, is there a rule that requires them to report at all? No. There is the general informal interpretations that the Commission has advanced. Now, if somebody were to come to the Commission with a, as happens, the pre-merger notification office and kind of lay out, here's the transaction that I propose, and it's outside of the pharmaceutical industry, but it looks very much like the sort of transactions that are covered by this rule, the pre-merger notification office would likely, if it saw that, say, we think that this is something that you should report. Okay, but I don't want to report. That's a pain. It's a lot of paperwork. It's a lot of delay, and you might throw a wrench in the works. I think of the regulations. The statute, don't see anything there. Regulations, don't see anything there. And your published regulations, it's just the pharmaceutical industry must mean I don't have to do it. And you said you can't come after them, there's no violation. Then there potentially is a gray area there where, and if the – Nothing is gray. I think the regulation says if it's not therapeutic, you don't have to report it. The Commission would, if it started to get this information, could then decide whether there's a gap there that it needs to fill with another, with either a broader rule on this or another rule that addresses those circumstances. But, you know, it's bedrock principle of administrative law, that that is generally what agencies get to do in rulemaking is to address problems. Well, they generally get to do that, but do you have cases where they get to do that when the statute already provides its own exemption process? But there's not, I mean, the fallacy of Pharma's argument is that if there is not a rule in place, that means everybody else is automatically exempted. By saying that there's not a rule that squarely tells people that may engage in similar transactions, which the Commission has not found, that that says that they necessarily have to report, does not mean that they're exempted. They're not off the hook. There's just a question as to whether there is sufficient guidance or affirmative obligation for them to know that they have to file. The Commission can if it gets additional information and starts to see these sort of transactions happening in other industries. Since it has not exempted other people, it's just said right now we don't have enough information in order to say that we need a rule and what that rule might look like. And so if it does, in fact, find those transactions in other industries, it can then formulate a rule. But it has not let everyone else off the hook. Would you take action against parties in other industries for failure to comply with what this rule says with respect to the pharmaceutical industry? Not with regard to this specific rule, because this specific rule applies to pharma, but with regard to- It would be statutorily based. Right, it is. Could you take action? The same way. Or would they win on failure of notice? The question of notice then is a close call. But under the HSR Act, the Commission, for example, the Commission could take action to enforce even in the absence of a rule. So, for example, the broader rule, that informal rule that the Commission has always advised parties that exclusive licenses under the make, use, and sell, that entire bundle, is something that is reportable. There is no formal rule that says that, but it is well established. And the Commission, if there are industries and pharma is where it principally sees those exclusive licenses, it could bring an action under the HSR Act itself, even in the absence of a formal rule. Now, as a- The fight's going to be on notice, right? The fight would be on notice, yes. But it does not mean that because there is not a formal rule that other industries are exempt. Why didn't the agency write a rule that appears more general and then in explaining it, say, for example, in the pharmaceutical industry, this is what we see, and if there are other such situations that we're putting everybody on notice. Well, potentially that is very confusing to industry. Why is that confusing? Then you don't have this argument. Well, it can be very confusing because the rule is not just for a whole patent. It's for the rights to part of a patent. And the question of what part of a patent you're talking about, in this case, we know that this is how the pharmaceutical industry transfers rights, either to the entirety of the patent or part of a patent. And we can articulate it very specifically in a way that provides them guidance. To do just a very broad patent or part of a patent that might apply to anyone else who possibly does this, although we haven't seen it, that could engender a tremendous amount of confusion. There may be over-reporting by people who say, oh, well, I've never thought of this. Is this part of a patent, not part of a patent? Well, maybe we'll be cautious and report it. But there's a tremendous cost that comes with that, and the pre-merger notification office would surely get flooded with calls. It would just be in the instance where we have not seen real-life examples of this. The Commission has made a very reasoned determination not to create a problem where none exists. What do you do with their argument that the record, with respect to your factual assumptions, doesn't exist? Well, it does exist because the Commission has explained the basis for its reasoning is that, in its experience administering the HSR program, and it has described the nature of this experience, the HSR filings that it has received, the inquiries for the pre-merger notification office, that has informed its decision because it gets these questions very frequently from pharma. It sees these sort of transactions from the pharmaceutical industry, not from others. That is sufficient for both the pharmaceutical industry, as they did, to challenge the basis for that decision by saying, no, as a matter of fact, we think that other industries engage in this, and they retained an expert who purported to do that. The Commission found that his arguments were not persuasive for the reasons that we stated in our brief. That is ample information for pharma to test, for this court to understand the Commission's rationale. And the cases don't require anything else in a determination of this sort, which is not based on technical studies, empirical data. It is based on the Commission's cumulative experience over years of administering the program. Why don't we require the agency, if it wants to make this type of determination under the statute, to make a specific finding? Not just that typically, and we haven't seen one, but we've looked, and based both on our experience and study, we have found no other industry that is doing this at this time. Shouldn't that specific finding be required? No, I don't think so, Your Honor. I don't think that there is precedent in the case law for this sort of determination for that. And it would be a very difficult thing. It would certainly be costly if we haven't seen a problem. And we're an agency, you know, we're the agency that people bring these sort of questions to. We're also informed by the Department of Justice's Antitrust Division's experience. That is an ample basis to get the sort of information that we need. It would be costly and, frankly, pointless if we haven't had a clue up until now, from all of those sources of information, that there are these transactions elsewhere. Your statements seem a bit more affirmative than the Federal Register, which had words like typically and left me a little bit unclear as to whether they were actually making a determination that, based on all our knowledge and study, this is the universe as of the time we're promulgating this rule. But that's not necessary. We don't need to find, as a factual certainty, that nobody else does this. Why? What if, in fact, there were one other? It doesn't happen often, but one other time. You were aware of one other time that energy drinks or whatever did this same thing, or disresolvance, and then you went ahead and wrote this rule. Is that okay, when you know that someone else has done it? It is okay. Why? Because, you know, the bedrock principle of administrative law is that where we perceive, where agencies perceive a problem, they can make a rule to address the problem. Just because there is perhaps someone. You're not making any determination that that other industry, when it does it, doesn't present the exact same anti-competitive concerns. Without making that determination, how is it that you could go 95% of what we see is pharmaceutical, so when pharma does it, it's covered, 5% other folks. We're not finding no anti-competitive effect. We're just letting them out of the regulation. Well, we always have the problem of drawing lines. You can't regulate. You can't try to regulate everything that might potentially be a problem or has been a one-off instance. Regulation, the sort of reasoned decision-making that the commission engaged in here has identified a problem. But doesn't that roll you up against your opponent's statutory argument about the way we read the no-person clause and the exemption clause together? Doesn't that suggest that you are supposed to act more broadly and neutrally and not target industries, unless they are completely unique? The hypothetical that Judge Millett gave you is they're not completely unique here. I don't think that it does run into the Chevron-type argument as to what the HSR Act requires. The HSR Act says nothing about whether the commission, in deciding how to define these broad, undefined terms in the Act, can define them in the specific context in which it understands them. And that, as the commission said in its rulemaking, it may be subject to further rulemaking if the commission comes to learn that there are other industries that engage in this and the commission gains enough understanding, assuming they exist, to formulate a rule that would be helpful. You don't mean to take on my colleague's hypothetical and insist that that's what we would have to say in an opinion. That is, she said, hypothetically, you know of someone else. Correct. But you write only this rule. We don't have to decide that case. No, absolutely. Your assumption in this record is you don't know of anyone else. That's correct. That's your record assumption, and that's what the argument I have with your opponent. That is, the who, as far as the agency is concerned, is limited to former non. Maybe there's more in the who, but we're not aware of it. That's correct. And if and when that comes, we'll deal with it. So it's really a fight about whether you're accurate on the who. You're not running into a statutory issue. Yes, that's correct. We don't have to decide that, well, if there was someone else and you failed to include them, that would still be okay. You answered it was okay. I thought your answer would be that's not our case. Well, it's not our case. That's true. And other industries had the opportunity to comment as well. You know, I mean, the rule was out there. It's only related to pharma, but it was no secret what these sort of transactions were. And we haven't heard from anybody else. Can you just help me with that, then? Where in the final rule or in the record can I look to find some assurance that this determination was based on the conclusion by the FTC that we've never seen anything else? We aren't aware of anything else? Sometimes it sounds like they're saying that, and sometimes it sounds like typically, which is a much more dangerous word. I really want to understand the record. I think the confusion is this. The question for the broader universe of exclusive patent licenses, the kind that would be captured by the broader make, use, or end sell, there has been the rare instance where the commission has seen exclusive licenses that fall into that broader. Again, very rare, as the commission said in its rulemaking in the last five years of the HSR filings. All of those have come from pharma. What the commission has really not seen from anyone outside of pharma is the type of all of the commercially significant rights being passed, but the holding back of some limited manufacturing rights and co-rights.  Just so we have some assurance that we're not deciding the 95-5% case, but we're deciding the, as of now, 100%. I understand I'm not talking about the general exclusive licensing. I'm talking about the subset of partial exclusive licenses or however you want to describe this setting. Sure. Which language is it that you think best conveys that? I think that... And if it's too long for you to find it, you could send a letter afterward. I want to hold everybody up. Sure. If it would be helpful, I can sit down and take a look at it. How much of it would point me to what you're relying? Because I found some sort of, sometimes the language seemed more specific, and other times it seemed a little bit looser. And so that's why. Right. I would have to look through this, but I couldn't do it. Thank you. Is that okay with the letter? Any other questions? I'll sit down. Thank you, Your Honor. Thank you. Mr. Young? Thank you, Your Honor. I think a lot of what the Court was just discussing started from the premise that it may well be legitimate in most areas of administrative law that agencies identify problems and then they regulate. But that default presumption was switched in this Act in which Congress prescribes the rule for coverage. It says if something is an asset, it doesn't matter whether we know or don't know, no person can do it except as exempted. Those textual conditions are central to the purpose of how this Act functions, and whether they know about it or even looked and couldn't find, no person means no person, which is exactly the way that the FTC has always administered this Act up until now. Can you tell me, just explain as a practical matter, how it would unravel the Act or impair the Act's operation or why Congress wouldn't have wanted them to be able, if they found this sort of unusual situation where partial transfers of rights, which might ordinarily not be thought of as an asset acquisition, but in this particular setting it, in fact, happens commonly, extraordinary amounts of money are on the line and it raises the same, in their judgment, anti-competitive concerns as a full grant of exclusive licensing. Why would Congress have not wanted them to be able to do that? Because Congress passed the HSR Act for the purpose of ensuring that the Commission would have notification of any high-threshold dollar amount transaction, regardless of who has that particular bundle of property sticks. I'm sorry, that the Commission would have notice or the Commission would give notice? The Commission would get notice from whoever wanted to pursue that transaction, regardless of who that person was or what industry they came from or whatever. And so there was a specific tool that was given to the agency in 18A. D2B is the exemption clause, and it says you can exempt classes of transactions. So, for instance, they could, if they really only wanted to focus on transactions at an even higher amount than the threshold, there are some exemptions like that. That could be neutral as well, but it would capture what you're saying the agency would want to see. I think that seems a little hard to me to think why Congress would, if they determined, and you can tell me if you think they didn't, but if they determined this is the only one we've looked, we can't find, we've never seen one, this is the only one, that the only way the agency can be specific and clear about what it means by asset acquisition in this context is to, in passing that regulation, pass another determination. And if anyone else in the world does it, we don't think that's anti-competitive. Wouldn't Congress want them to be very, very careful before making, if anyone else is out there doing it, we don't know about it, we don't understand it, but I guess we have to decide it's anti-competitive up front before we even know what it is. If the exemption is on the basis of person, then what the statute says is they have to decide that whomever they exempt is not likely to violate the antitrust law. I don't think they could just do a global exemption of everybody except, it's not so easy. They haven't exempted anybody. Well, that's correct. They haven't, they've never purportedly used their exemption authority. The district court said it's a split side. There's no exemption here. As a practical matter, as was discussed a little earlier, nobody else has to follow this burden. No, that's not true. It, in fact, is true. That's an underlying assumption. That's just not accurate. Well. There's a statutory prescription. There could be a fight on notice. And the first time, if they lose that the first time, that would be the last time they would lose it, because then they would be noticed. The agency still has the right to enforce the statute. Whether or not they capture all of it in regulations is a different question. They have not exempted other industries that might be out there. And they might take on someone if they find it, and they might lose it on notice. The Supreme Court said in the FCC case you could. Sometimes you do, sometimes you don't. They have not exempted anyone. Your Honor, they indeed can enforce against anyone, including the pharmaceutical industry. That's entirely separate from the Hart-Scott-Rodino Act. What we're talking about is the notification burden. And what they said, JA-77, you know, this kind of transaction is non-reportable until this rule, which makes it reportable exclusively for the pharmaceutical industry. It is not reportable for any other industry because of this rule. But it is for pharmaceutical industry. Exact same transaction. No difference in dollar amount. No difference in any economic. We don't know if there are others out there. We don't have as much experience. You know, I think page 40, footnote 10 of our opening brief, gives a few examples of how the agency has said we typically see it, almost solely see it, almost solely occurs in that industry. That's a far cry from no person is exempt from notification, unless specifically exempted under a particular statute. And that's all we're really asking for is that this agency do what it has always done, adopt rules, much like Judge Edwards, you said, in my colleague's response, why couldn't they adopt a general rule and then provide guidance? You know, they can have comments. We have a lot of them in this room. I knew you would like that. Yes, and I'm very appreciative because I think it makes good sense, and it's good policy, and it fits the purpose of why Congress adopted this act in the first place. Can you answer quickly, if someone's supposed to report and doesn't, is it a fine? $11,000 a day, I believe, from the date in which they were supposed to have reported. You can see that for the pharmaceutical industry, there are pretty serious burdens here. The cost of complying with reporting is high. The time delay is great for drugs that are trying to get to market in the most efficient way. It's a unique burden on one industry without any real explanation for why, why they would pick a kind of transaction that has never been enforced against, outside of Hart-Scott or inside of it, to say in this one kind of industry, we're going to break our practice that we've followed since the beginning and target a single industry for a kind of transaction that's never given anybody any problem, even though we could have enforced it against them at any point. And we can unwind. It's easy to unwind. That's another purpose of the Hart-Scott Act, is to make sure that transactions don't go through without notification because they're so hard to unwind. All of those may get to the what question, but the who question really is what's central here. There's no basis in this record to say that prevalence exists. There's no basis to say that prevalence is a proxy for antitrust risk. If we start to get into the realm of selective imposition, and because it violates the tech structure, history, and purpose of this act, we would ask this court to vacate the rule and reverse the judgment of the district court. Thank you, Mr. Young. Ms. Arrington, did you have a record site? If you want to add something to what she's saying. I guess the clearest articulation would be the statement in the first paragraph, under limitation to the pharmaceutical industry, the P&O has not found other industries that rely on these type of arrangements. I'm sorry, you said JA-77? Sorry, I took my regulation out. And which column is it? Ms. Arrington. It's the central column. It's under limitation to the pharmaceutical industry. I mean, I guess the key is there is that rely. I guess that doesn't exclude that there might not be an instance, but as a form of transactions that are used in the industry that the commission has seen, and hasn't seen ones that rely on these sort of transactions. Well, all I would respond is in that very same paragraph on JA-77, if you read the whole paragraph, you'll see that the commission says, although it's possible for other industries to engage in the kind of exclusive licensing that typifies the pharmaceutical industry, the P&O has not processed these. And it says that the 66 in the past five years, well, they weren't even that for the pharmaceutical industry. They continue on, it says, exclusive patent licensing transactions have generally been limited to the pharmaceutical industry. I think you can read through JA-70 has more to rebut this. This is not something that really has ever been disputed, that this truly is unique. Thank you very much. We have your arguments. The case is submitted.
judges: Griffith, Millett, Edwards